UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF WISCONSIN

---

*In re*:                                                                                          Case Number: 20-10232-7

    DALE A. KRIZAN,

          Debtor.

---

    TRAVIS P. KRIZAN and
    RONALD V. KRIZAN,

          Plaintiffs,
    v.                                                                                     Adversary Number: 20-16

    DALE A. KRIZAN,

          Defendant.

---

## **DECISION**

Dale A. Krizan ("Dale") filed a voluntary chapter 7 petition. Travis P. Krizan and Ronald V. Krizan ("Plaintiffs") timely filed an adversary proceeding to determine Dale's debt nondischargeable under 11 U.S.C. § 523(a)(2)(A). For the reasons set forth below, the Court concludes that the debts of Dale to Plaintiffs are dischargeable.

### **FACTS**

Plaintiffs also started adversary proceedings in the cases of Scott Krizan and Beverly Krizan (collectively, Dale, Scott, and Beverly are "Defendants"). The debts asserted against Defendants are the same and the conduct is inter-related in all three adversaries.

The debts were the subject of extensive state court litigation, but the bankruptcy filings of the Defendants stayed any decision in state court.

Many facts are not in dispute. The disputed facts pertain to content of certain conversations rather than existence of those conversations.

Daniel (now deceased) and Beverly Krizan owned real property in Wisconsin. The property was encumbered by a mortgage held by Farm Credit Services ("FCS"). Beverly and Daniel defaulted on the mortgage. FCS filed a foreclosure action.

Dale decided to help his parents stop the foreclosure. He undertook a variety of ways to do so. This included:

- A quit claim deed from Beverly and Daniel to Otis Williams in June 2012. There was no consideration for this deed.

- Otis filed the quit claim deed on April 26, 2013.

- Four days later, Otis filed a real estate UCC.

- On May 2, 2013, Daniel, Beverly, and Scott signed to accept an offer to purchase from Chad and Beverly Webster.

While this may have slowed the foreclosure, it did not stop it. FCS scheduled a sheriff sale to be held on April 1, 2014. Again, Dale stepped in to try to stop or slow the sale. He did so in February 2014 through the granting of life estate interests in the property to himself and his brother Scott. While Otis quitclaimed the property back to Daniel and Beverly in March, he did not release the UCC filing.

These actions did not halt the foreclosure and the sale was scheduled to proceed on April 1. Another offer was submitted by the Websters dated March 27, 2014. It became clear that to avoid the sheriff sale it would be necessary to pay off FCS. At that point, the evidence indicates Scott stepped in and began discussions with Plaintiffs about a sale. Those discussions resulted in:

- Plaintiffs making a handwritten offer the day after the Websters' second offer. Plaintiffs' offer was signed by Plaintiffs as well as Beverly, Daniel, and Scott Krizan. It provided that the Plaintiffs would pay off the $430,000 mortgage as a down payment on the purchase.

- The next day Plaintiffs, Beverly, Daniel, and Scott went to FCS and Plaintiffs paid off the FCS mortgage.

- A typed, formal version of the Plaintiffs' offer was signed on March 30, 2014. This offer included some additional provisions including provisions for rental of the house from Plaintiffs and forgiveness of a Promissory Note (the "Offer").

There is no evidence Dale participated in the negotiations for or discussions related to the Offer.

Plaintiffs, Beverly, Daniel, and Scott then prepared for and attended a closing. All of the documents necessary for the sale were signed. The closing agent then ran a title check and discovered that the Websters had filed a *lis pendens* in connection with an action against Daniel, Beverly, and Scott. Scott was served before the closing and discussed the *lis pendens* with his parents. They decided to proceed with closing the Offer. Because of the *lis pendens,* the sale could not close. Again, there is no evidence of participation in those discussions by Dale.

Ultimately a state court determined the Webster offer was the primary offer and the property was sold to the Websters. At the closing, the Plaintiffs received a payment equal to the amount they paid FCS.

Without distinguishing among the Defendants, Plaintiffs claim Defendants knowingly and fraudulently represented the Offer was the primary offer when it was not. As a result of this representation, the FCS mortgage was paid in full. Plaintiffs take further issue with Defendants' failure to even attempt to repay Plaintiffs throughout the state court action.

Dale's defense is that he signed nothing, was not present when any conversation with the Plaintiffs occurred, and had nothing to do with the Offer. Plaintiffs do not dispute that Dale was not physically present during any conversation. He wasn't a party to the offer. Plaintiffs produced no evidence of any representations in connection with the offer from Ronald and Travis. Still, they believe he was the mastermind directing all the decisions made by Scott and Beverly.

Beginning in 1994 and continuing for many years, Ronald provided hay to Daniel on open account and made some cash loans (collectively "Loans"). Ronald kept track of the amounts owed and began accruing interest and reflecting payments. In 2002, an accounting of those amounts with interest was prepared by Ronald and signed by him, his wife, and the Defendants. Updated versions of this were periodically prepared and signed. Adv. No. 20-15, ECF No. 37, Exh. 12.

In addition to the hay and cash to Daniel, Ronald made a loan of $10,000 to Dale in 2009. A separate paper was prepared and signed by Dale acknowledging there was a loan in that amount and that interest was owed. Adv. No. 20-15, ECF No. 37, Exh. 12 at 13.

Plaintiffs refer to the debts of Daniel for hay and cash plus the loan to Dale as a single debt ("Promissory Note"). They assert these amounts are nondischargeable. Their argument is the Offer said that Travis would assume the Promissory Note as part of the consideration for the Offer. Travis expected he would receive rent from Daniel, Beverly, and Scott that he would use to make payments on the Promissory Note to Ronald. Since the Offer said he would pay Ronald, Plaintiffs say that means the amounts are also owed to Travis.

Dale acknowledges that he received a loan of $10,000 from Ronald in 2009 and that he did not repay the loan ("Dale Loan"). He says at the time of the loan he did intend to make repayment. He says there were no misrepresentations connected to the loan. The signatures on the interest calculations were not promises by Dale to pay. Instead, he says the signatures simply confirmed the interest calculations on debts of Daniel.

### LEGAL STANDARDS

**11 U.S.C. § 523(a)(2)(A)**

> A discharge under section 727… or 1328(b) of this title does not discharge an individual debtor from any debt--

5

> for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by--
>
> > (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

### DISCUSSION

**Jurisdiction**

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334(a). Venue is proper under 28 U.S.C. §§ 1408 and 1409. The issue before this Court is the dischargeability of certain debts. It falls within the parameters of "determinations as to the dischargeability of particular debts." 28 U.S.C. § 157(b)(2)(I).

**Nondischargeability**

Plaintiffs seek a determination of nondischargeability of debt stemming from two transactions. The first amount is for the money used to pay off FCS (and related interest and attorneys' fees). The second debt is for the Promissory Note—money loaned to Daniel over decades plus a $10,000 loan to Dale in 2009[1] (collectively "Debts").[2]

Plaintiffs claim the Debts are nondischargeable under 11 U.S.C. § 523(a)(2)(A). Prevailing on a nondischargeability claim for false pretenses or

---

[1] Adv. No. 20-15, ECF No. 37, Exh. 12 at 13.

[2] There is an additional amount included in Plaintiffs' claims. It appears, however, to be only a claim against Scott for $2,700 given to Scott after the *lis pendens* came to light.

false representation requires that Plaintiffs demonstrate, by a preponderance of the evidence:

>   (1) the debtor made a false representation or omission,
>
>   (2) that the debtor (a) knew was false or made with reckless disregard for the truth and (b) was made with the intent to deceive,
>
>   (3) upon which the creditor justifiably relied.

*Ojeda v. Goldberg*, 599 F.3d 712, 717 (7th Cir. 2010). False pretenses are:

> [A] series of events, activities or communications which, when considered collectively, create a false and misleading set of circumstances, or false and misleading understanding of a transaction, in which a creditor is wrongfully induced by the debtor to transfer property or extend credit to the debtor … A false pretense is usually, but not always, the product of multiple events, acts or representations undertaken by a debtor which purposely create a contrived and misleading understanding of a transaction that, in turn, wrongfully induces the creditor to extend credit to the debtor. A "false pretense" is established or fostered willfully, knowingly and by design; it is not the result of inadvertence.

*Rezin v. Barr (In re Barr)*, 194 B.R. 1009, 1019 (Bankr. N.D. Ill. 1996). A false representation or omission can come in many forms. Silence (or omission) regarding a material fact can constitute a false representation. *Deady v. Hanson (In re Hanson)*, 432 B.R. 758, 772 (Bankr. N.D. Ill. 2010). "A debtor's failure to disclose pertinent information may be a false representation where the circumstances imply a specific set of facts and disclosure is necessary to correct what would otherwise be a false impression." *Id.*

Claims for actual fraud under this statute require that Plaintiffs demonstrate:

>   (1) "Actual fraud" occurred;

7

(2) the debtor intended to defraud the creditor; and

(3) the debtor's actual fraud created the debt at issue.

*Zamora v. Jacobs (In re Jacobs)*, 448 B.R. 453, 471-72 (Bankr. N.D. Ill. 2011).

"[A]ctual fraud is broader than misrepresentation." *McClellan v. Cantrell*, 217 F.3d 890, 893 (7th Cir. 2000). Actual fraud:

> consists of any deceit, artifice, trick or design, involving the direct and active operations of the mind used to circumvent or cheat another . . . .

*Christenson v. Lee (In re Lee)*, 415 B.R. 367, 371-372 (Bankr. E.D. Wis. 2009). "When a debtor intentionally engages in a scheme to deprive or cheat another of property or a legal right, that debtor has engaged in actual fraud and is not entitled to the fresh start provided by the Bankruptcy Code." *Mellon Bank, N.A. v. Vitanovich (In re Vitanovich)*, 259 B.R. 873, 877 (B.A.P. 6th Cir. 2001).

### A. MONEY, PROPERTY, SERVICES, OR AN EXTENSION, RENEWAL OR REFINANCING OF CREDIT

There was money obtained to pay off FCS. Plaintiffs entered into an offer to purchase with Scott, Daniel, and Beverly. Dale was not a party to the Offer.

Plaintiffs paid $430,000 to FCS. Dale was not present when the payment occurred. He was not an obligor on the FCS note and mortgage. There was no evidence presented that he participated in or benefited from that transaction. And no evidence was presented that he made any representation to Plaintiffs in connection with the Offer.

Although the money was paid to FCS and not directly to any of the Defendants, a debtor need not receive money directly. *First Am. Title Ins. Co. v.*

8

*Speisman (In re Speisman)*, 495 B.R. 398 (Bankr. N.D. Ill. 2013) (rejecting debtor's argument that the debt could not be determined nondischargeable against him because he did not personally obtain any money or property). In fact, courts are split on whether there even needs to be *any* benefit to the debtor. *See, e.g., Husky Int'l Elecs., Inc. v. Ritz (In re Ritz)*, 567 B.R. 715 (Bankr. S.D. Tex. 2017) (discussing three approaches adopted by courts and ultimately finding no "receipt of benefit" requirement). He was not released from any liability. He received no money. Plaintiffs did not identify any benefit to him and the Court will not conjecture about possible benefits.

Ronald tries to tie the Promissory Note into the debt for the Offer by arguing that there was to be forgiveness of the Promissory Note and an assumption of that debt by Travis as part of the Plaintiffs' purchase. Although Plaintiffs asserted forgiveness of the Promissory Note was a consideration in the Offer, no debt was forgiven because no closing ever happened. Further, the advances in cash and in kind to Daniel and the Promissory Note pre-dated the Offer by years.

There is no evidence of any misrepresentation by Dale leading to the Promissory Note. There was no dispute at trial that the debts for the Loans consisted of sale of hay to Daniel on account over a period of more than 15 years plus some cash. There was a separate loan to Dale. All of those debts arose well before any sale to Ronald and Travis was contemplated.

Further, since the sale to Plaintiffs never occurred, there was no "consideration" paid in the form of forgiveness of indebtedness. More

determinative, however, is the fact that there is no evidence Dale participated in, negotiated, or made representations about the Offer or had any knowledge of a term in the Offer related to the Promissory Note. As a result, there is no evidence of any representation by him in connection with the Offer. Plaintiffs did not viably establish that the "old" debt consisting of the hay loans and the Promissory Note was an "extension, renewal, or refinancing" of credit. Since this was not established, the alleged forgiveness of debt is not an amount that can be held nondischargeable. Further, although Dale's signature may appear on the accounting writings which show a debt, it does not establish the debt was Dale's or that Dale agreed to assume those debts. Those writings contain no promise to pay. Any remaining discussion of nondischargeability does not relate to the alleged forgiveness of these amounts.

Plaintiffs have failed to establish any money was obtained by Dale other than the Dale Loan. Further, no misrepresentations of Dale have been proven by Plaintiffs leading to either the Offer, the Promissory Note, or the Dale Loan. Plaintiffs have failed to establish this element of their claims.

**B. INTENT**

"It is a fundamental principle of bankruptcy jurisprudence that exceptions to discharge are to be construed strictly against a creditor and liberally in favor of the debtor." *Westlund v. Casper (In re Casper)*, 440 B.R. 500 (Bankr. W.D. Wis. 2010). This is because one of the purposes of bankruptcy is a "fresh start." But this is only available to the "honest but unfortunate debtor." Debt for money obtained by false pretenses, false representation, or

10

actual fraud is nondischargeable. 11 U.S.C. § 523(a)(2)(A). The party seeking the determination that the debt is nondischargeable must establish the elements by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291 (1991). Every cause of action under 11 U.S.C. § 523(a)(2)(A) requires intent. Intent is measured at the time the false or fraudulent conduct occurred. *Jacobs*, 448 B.R. at 472. Although later actions can be considered to be an indication of a debtor's state of mind, "subsequent representations or acts do not establish that the debtor had the requisite intent at the time the representation was made or the act was carried out." *Id.* Direct proof of intent is often hard to come by. Intent can be inferred from circumstantial evidence. *Id.* "The court may consider such factors as the debtor's knowledge of and experience in financial matters, as well as whether the debtor exhibited a clear pattern of purposeful conduct when inferring deceitful intent of a debtor." *United Leasing, Inc. v. Flores (In re Flores)*, Case No. 16-70112, Adv. No. 16-7023, 2018 WL 3753003, at *6 (Bankr. S.D. Tex. Aug. 6, 2018).

      Although Dale engaged in actions with Scott, Daniel, and Beverly that were deceitful, duplicitous, and false, none of those actions happened as part of the Offer or Promissory Note. Instead, together the Defendants engaged in cunning actions to impede FCS from exercising its rights and remedies. While those actions may have slowed the foreclosure, it was not stopped. Subsequently, Scott, Beverly, and Daniel took other actions resulting in the Offer. No evidence was presented that Dale played any part leading to the Offer.

Neither was any evidence presented that at the time of the Dale Loan there was any intent to deceive the Plaintiffs.

For these reasons, Plaintiffs have failed to establish any deceitful intent of Dale related to the Plaintiffs.

### C. FALSE REPRESENTATIONS AND FALSE PRETENSES

Dale was not present at any discussion with the Plaintiffs relating to the Offer. He did not participate in any discussion or negotiation with Plaintiffs about the Offer. Although believing he was somehow involved, Plaintiffs presented no evidence of any involvement of Dale in the Offer. There is no basis to conclude he made any false representation for the Offer. Neither is there any evidence of false representations related to the Promissory Note. He acknowledged borrowing the money and intending to repay it. He did not repay. The failure to repay a loan is not a false representation or pretense.

Plaintiffs suggest that Dale had a duty to reach out and inform them of the Webster offer. This argument fails. Dale wasn't a party to the Offer. There is no proof he had knowledge of it until after Plaintiffs paid FCS.

Although Plaintiffs theorize there was a conspiracy involving Dale, this is simply based on their belief he must have been involved and been the architect of everything that happened. Conjecture about his role and knowledge is not sufficient to satisfy Plaintiffs' burden of proof. No conspiracy has been established. Plaintiffs have failed to satisfy this element.

### D. ACTUAL FRAUD

Undoubtedly several actions of Dale were fraudulent. Dale demonstrated a disregard for the truth in those actions. Unfortunately for Plaintiffs, none of the actions were related to the Plaintiffs' claim. Instead, those actions related to frustrating FCS's attempts to foreclose on the property. Dale's actions include working with his parents to place a mortgage on their property to Otis, permitting the UCC to Otis, and the quit claim deeds from Beverly and Daniel to Dale and Scott. Dale admits all those actions were designed to stop the foreclosure of the farm. He also admits Otis's lien on the property was completely unsubstantiated.

Dale's testimony showed a lack of remorse for his actions. Even so, however fraudulent or dishonest those actions were, they were done before the Offer. The actions did not lead to or create the transactions with Plaintiffs. Plaintiffs failed to connect Dale's actions to fraud resulting in Plaintiffs' payment. Plaintiffs did not establish any connection between Dale's reprehensible actions with FCS and the Offer.

Plaintiffs have failed to establish actual fraud.

### E. CONSPIRACY

Plaintiffs' theory is that Dale is a co-conspirator and so is liable for all of the damages related to the Offer or Promissory Note. Finding "members of a conspiracy are legally responsible for the actions of a co-conspirator taken in furtherance of the scheme," some courts have denied dischargeability of such co-conspirators. *Aetna Cas. & Sur. Co. v. Markarian (In re Markarian)*, 228 B.R.

13

34 (B.A.P. 1st Cir. 1998). In denying the dischargeability of a particular debt where the debtor is a co-conspirator, courts have reasoned that "[t]he statute focuses on the character of the debt, not the culpability of the debtor . . . ." *Deodati v. M.M. Winkler & Assocs. (In re M.M. Winkler & Assocs.)*, 239 F.3d 746, 749 (5th Cir. 2001); *see also MacDonald v. Buck (In re Buck)*, 75 B.R. 417, 420-421 (Bankr. N.D. Cal. 1987) ("[A] debtor who has made no false representation may nevertheless be bound by the fraud of another if a debtor is a knowing and active participant in the scheme to defraud."); *Madison Res. Funding Corp. v. Marsh (In re Marsh)*, Case No. 18-43273, Adv. No. 18-04198, 2021 WL 373251 (Bankr. D. Minn. Jan. 25, 2021) (finding debt of co-conspirator nondischargeable upon Plaintiff's demonstration of the existence of a conspiracy); *Trans-West, Inc. v. Mullins (In re Mullins)*, Case No. 16-13773, Adv. No. 16-01282, 2020 WL 5846952 (Bankr. D. Colo. Sept. 30, 2020) (finding debt nondischargeable based on wife's involvement in the conspiracy).

In *Cowin*, the debtor appealed a determination that a particular debt was nondischargeable, arguing "the bankruptcy court erred in imputing to him the actions and *intent* of his co-conspirators in determining nondischargeability." *Cowin v. Countrywide Home Loans, Inc. (In re Cowin)*, 864 F.3d 344, 349-50 (5th Cir. 2017). The Fifth Circuit in *Cowin* opined:

> Cowin does not challenge the bankruptcy court's findings that he participated in the civil conspiracy to deprive Countrywide of excess proceeds from foreclosure sales or that he owes Countrywide a debt stemming from the resulting state law violations. Nor does Cowin dispute the court's conclusion that together, Cowin and his co-conspirators committed illegal acts constituting "larceny" within the meaning of § 523(a)(4). Accordingly, Cowin's debts to the Country-

14

wide Plaintiffs (and Bank of America) "arise" from larceny and are nondischargeable in bankruptcy.

*Cowin*, 864 F.3d at 351. Even so, not all courts have adopted this approach. Some courts strictly only impute liability where the debtor is the actual perpetrator or there is an agency relationship. *See Reisman v. Ingredients Int'l, LLC (In re Reisman)*, Case No. 04-19378, Adv. No. 04–01361, 2006 WL 6811010 (B.A.P. 9th Cir. Aug. 18, 2006) (rejecting *Markarian* and *Buck* because of their inconsistency with the 9th Circuit B.A.P. decision in *Tsurukawa v. Nikon Precision, Inc. (In re Tsurukawa)*, 287 B.R. 515 (B.A.P. 9th Cir. 2002), which reasons that holding a debtor accountable for fraud can only occur where debtor is a direct participant or there is an agency relationship).

Under Wisconsin law, co-conspirators are liable for acts committed by other participants of the conspiracy. In Wisconsin, "civil conspiracy is a combination of two or more people, by some concerted action, to accomplish some unlawful purpose or some lawful purpose by unlawful means." *Kroeger v. Brautigam*, 371 Wis. 2d 758 (Wis. Ct. App. 2016). The elements are "(1) The formation and operation of the conspiracy; (2) the wrongful act or acts done pursuant thereto; and (3) the damage resulting from such act or acts." *Id.* Further:

> For a conspiracy to exist, there must be, at a minimum, "facts that show some agreement, explicit or otherwise, between the alleged conspirators on the common end sought and some cooperation toward the attainment of that end." *Augustine v. Anti–Defamation League of B'nai B'rith*, 75 Wis. 2d 207, 216, 249 N.W.2d 547, 552 (1977). It is not enough that the defendants may have acted in concert or with a common goal. *Sparkman v. McFarlin,* 601 F.2d 261, 268 (7th Cir. 1979).

*Bartley v. Thompson*, 198 Wis. 2d 323 (Wis. Ct. App. 1995).

Plaintiffs allege "Dale A. Krizan assisted in a ruse or fraud to declare the Webster offer invalid . . ." and that Dale's involvement "in this process of defrauding plaintiffs in the offer they made based upon the misrepresentations made to the plaintiffs" caused "plaintiffs to pay the massive down payment they paid on March 28, 2014." ECF No. 7 at 3.

Plaintiffs have failed to establish the existence of such conspiracy. Plaintiffs assert Dale was the master architect in the scheme to delay the foreclosure. While he certainly was engaged in actions with the other defendants in 2013 and early 2014 to forestall the foreclosure, no evidence was presented to support a claim of any action by him connected to the Offer. On February 25 and 26, 2014, the life estates suggested by Dale were granted to Dale and Scott. Then, on March 26, those transactions were reversed by quitclaiming the interests back to Daniel and Beverly.

Plaintiffs never defined the alleged conspiracy or identified the acts that made it up. Plaintiffs did not tie Dale's actions to a larger scheme or in any way to the transactions with the Plaintiffs.

When the closing on the Offer failed, Daniel or Scott immediately indicated the Webster offer was not valid. It was suggested at the closing that the Webster offer had never been delivered. Dale was not at the closing. Plaintiffs submit the "non-delivery" ruse was Dale's creation. No evidence to support this claim was presented.

16

Scott contested this claim at trial testifying that, although he did not know where the statement originated from, he did not discuss the idea with Dale before making it. It also appears the statement was first made at the closing by either Scott or Daniel. While Dale may have gone along with this position in the state court litigation, there is no evidence he made the statement or that he was the source of the statement.

In any case, FCS had already been paid, its note satisfied, and its mortgage released.  As a result, any statements about non-delivery could not have been inducements for the Offer or representations leading to its execution or the payment to FCS.  All of those things happened before any statements about non-delivery.

While conceding he might have thought of non-delivery as an explanation, Dale also asserted that Scott was afraid to tell him he delivered the Webster offer and so Dale had no idea how the Webster offer made it to the Websters. The testimony about discussions was imprecise as to exact time, but they appear to have occurred after the Offer and payment to FCS.

Although Plaintiffs made a case that Dale's actions might have constituted fraud against FCS, they failed to connect those actions to the debts at issue before this Court.

## Conclusion

Plaintiffs have failed to establish by a preponderance of the evidence that Dale obtained money through false representations, false pretenses, or actual

17

fraud. No actions of Dale have been demonstrated to be connected to the events leading to the $430,000 payment under the Offer.

Nor have Plaintiffs demonstrated that Dale's actions along with any actions by Scott or Beverly have gone beyond the parties acting "in concert or with a common goal" in connection with the FCS foreclosure. Plaintiffs have not met their burden in demonstrating the existence of a conspiracy.

The Promissory Note pre-dates the Offer by years. No evidence of any fraud or misrepresentation occurring at the time of the $10,000 loan was presented. The same is true with respect to the amounts comprising the Loans.

The claims of the Plaintiffs against Dale are hereby dismissed without costs.

This decision shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and Rule 52 of the Federal Rules of Civil Procedure.

A separate order consistent with this decision will be entered.

Dated: July 15, 2021

BY THE COURT:

_____
Hon. Catherine J. Furay
U.S. Bankruptcy Judge